**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-CR-203-PAM-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| FRANCISCO MIGUEL RODRIGUEZ VALENZUELA, | |
| Defendant. | |

This matter is before the Court on Francisco Miguel Rodriguez Valenzuela's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment. [ECF No. 30]. Mr. Rodriguez is charged with possession with the intent to distribute methamphetamine in violation of 18 U.S.C. §§ 841(a) and (b). Indict. [ECF No. 1]. He asks the Court to suppress all evidence obtained as a result of a traffic stop on August 23, 2020. Mr. Rodriguez claims that the stop was made without reasonable suspicion of criminal activity.[1] The Court held a hearing on the motion on November 3, 2020, at which South St. Paul Police Sergeant Richard Schwab testified for the government. Tr. of Hr'g ("Tr.") [ECF No. 50]. The Court also received several exhibits into evidence, including a recording of a 911 call, squad car videos, and body-worn camera footage. Joint Ex. List [ECF No. 49]. After the hearing, the parties submitted written argument regarding the constitutionality of the August 23rd stop.

---

[1] In addition to the legality of the stop, Mr. Rodriguez originally challenged the subsequent warrantless search of the vehicle as a separate Fourth Amendment violation, but he has expressly waived this argument in his post-hearing brief. Def.'s Mem. at 1 n.1 [ECF No. 53].

Def.'s Mem. [ECF No. 53]; Gov't Mem. [ECF No. 54]. For the reasons that follow, the Court recommends that Mr. Rodriguez's motion to suppress be denied.

## I.    Background

At around 10:00 p.m. on August 23, 2020, an after-hours security guard at Sportsman's Guide in South St. Paul called 911 to report that a Hispanic man with a black t-shirt and goatee was parked haphazardly in front of the store in a black Honda Civic and refused to leave. Gov't Ex. 1; Tr. 11–12. The police dispatcher described the occupant as "obviously on drugs"[2] and relayed that when the store's security guard asked him to leave, he told the security guard to "mind [his] own business."[3] Tr. 11–12. The dispatcher also reported that Mr. Rodriguez was counting money. *Id.* Two South St. Paul police officers—Sergeant Schwab and his partner Officer Gelhaye—received the dispatch and responded to the scene in separate cars about a minute later.[4] *Id.* at 12–13.

When the officers arrived, they spotted a dark-colored car parked near the front of the store. *Id.* at 14, 31. It appeared to be the only running vehicle in the parking lot at the time. *Id.* Sergeant Schwab testified that as he neared the vehicle, he noticed it was blue, not

---

[2]    Sergeant Schwab explained that his "CAD notes," which is information relayed by dispatch, described the man in the Civic as "obviously" being on drugs. Tr. 27. In the recording of the 911 call, the caller states that the individual was "clearly" on drugs. Gov't Ex. 1 at 00:20.

[3]    Sgt. Schwab testified that the driver told the security guard to "mind [his] own business," Tr. 11, 30, but at the time of the stop, he told other officers that the driver told the security guard "don't worry about it." Gov't Ex. 2 at 21:57:14. However, this distinction has no practical effect, because there is little difference between the two phrases.

[4]    Sergeant Schwab was wearing a bodycam at the time and activated it during the officers' encounter with Mr. Rodriguez. Tr. 13. The bodycam recording was received into evidence. Gov't Ex. 2.

black—the car turned out to be a blue Nissan Sentra). *Id.* at 25. The car started to slowly roll forward towards Officer Gelhaye's car, and at this point, the officers stopped the car by pinning it in the parking lot. *Id.* at 25, 27. When the car came to a stop, the officers could not see the driver, who was still inside the vehicle. *Id.* at 25, 27–28, 34; Def. Ex. 1 at 21:52:47; Def. Ex. 2 at 00:21. Sergeant Schwab testified that it was only after the officers stopped the car that they were able to confirm that the driver, later identified as Mr. Rodriguez, matched the description provided by the dispatcher. Tr. 25, 27–28, 34.

After the car came to a stop, Mr. Rodriguez stuck his head and hands out of the driver's side window and began to exit the car. *Id.* at 15–16, 27–28, 34; Def. Ex. 1 at 21:52:47; Def. Ex. 2 at 21:52:47. The officers approached Mr. Rodriguez on foot and ordered him back inside the car. Tr. 16, 28; Gov't Ex. 1 at 21:53:10. Mr. Rodriguez sat down in the driver's seat, but he left the door open and angled himself towards the officers such that his legs were still dangling outside the vehicle. Tr. 16, 28; Gov't Ex. 1 at 21:53:10.

The officers questioned Mr. Rodriguez about where he was from and what he was doing in the parking lot after hours. Tr. 16. They also checked for signs of impairment because the dispatch said the person seen in the parking lot was on drugs. *Id.* at 16–17. During the encounter, Sergeant Schwab saw a handgun and a significant amount of cash on the floor in front of the passenger seat from his vantage point outside the vehicle. *Id.* at 18-19; Gov't Ex. 1 at 21:54:17. The officers then handcuffed Mr. Rodriguez and led him away from the vehicle. Tr. 19; Gov't Ex. 1 at 21:54:20. After Mr. Rodriguez admitted that he did not have a permit for the handgun, the officers returned to search the car, where they recovered the handgun, methamphetamine, and over $50,000 in cash. Tr. 19–21.

## II.   Discussion

Mr. Rodriguez now seeks to suppress the evidence obtained during the August 2020 investigative stop. He specifically argues that law enforcement lacked reasonable suspicion to justify their investigative stop of his vehicle and related questioning. For the following reasons, the Court recommends that Mr. Rodriguez's motion be denied.

The officers seized Mr. Rodriguez for Fourth Amendment purposes when they pinned him in the parking lot, and forced him to stop his vehicle. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that an individual is seized upon submission to a show of authority). In *Terry v. Ohio*, the Supreme Court held that such investigative stops are permissible under the Fourth Amendment only when supported by reasonable suspicion that the person stopped is involved in criminal activity. 392 U.S. 1, 30 (1968); *U.S. v. Arnold*, 835 F.3d 833, 838 (8th Cir. 2016). A *Terry* stop is valid if an officer can point to "specific and articulable facts" and rational inferences drawn from those facts to support his reasonable suspicion. *U.S. v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (citing *Terry*, 392 U.S. at 21). The same standard applies to a brief investigatory stop of an automobile. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) ("[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity.") (internal quotation marks omitted). The presence and subsequent corroboration of a tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *See Navarette v. California*, 572 U.S. 393, 397 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)) (internal quotation marks omitted); *see also Adams v. Williams*, 407 U.S. 143, 147 (1972) (rejecting the

argument that "reasonable cause for a[n investigative stop] can only be based on the officer's personal information, rather than on information supplied by another person").

Ultimately, whether reasonable suspicion exists depends on the totality of the circumstances. *U.S. v. Dillard*, 825 F.3d 472, 475 (8th Cir. 2016) (citing *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002)). The Supreme Court has repeatedly stated that this totality of the circumstances analysis should be guided by "'commonsense' and 'nontechnical' concepts instead of 'finely-tuned standards.'" *Dillard*, 825 F.3d at 475 (quoting *Ornelas v. U.S.*, 517 U.S. 690, 695–96 (1996)). Analyzing the totality of the circumstances in this case, the Court finds that the officers had reasonable suspicion to stop Mr. Rodriguez in the Sportsman's Guide parking lot.

## A. Reliability of the 911 Caller's Information

The 911 call placed by the security guard who had spoken with the man in the parking lot contained many details, supporting an inference of reliability. Beyond simply providing identifying information about the vehicle (a black Honda Civic parked haphazardly in front of the store) and driver (a Hispanic man with a black t-shirt and a goatee), the security guard told the dispatcher about a specific interaction he had with the driver. The security guard said that he approached the vehicle and asked the driver to leave, but the driver "wasn't really making a lot of sense" and told the security guard "don't worry about it." Gov't Ex. 1 at 01:50. The security guard added that the driver was counting money and "pretty clearly on drugs." *Id.* at 00:20. The security guard's detailed eyewitness account of this interaction with the driver—which he reported to the police almost immediately after it occurred—"lends significant support to the tip's reliability." *See Navarette*, 572 U.S. 399

(explaining that the detailed contemporaneous nature of the 911 tipster's eyewitness report showed that the tipster had a strong "basis of knowledge") (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)).

The security guard's decisions to both report this incident via 911 and identify himself to the 911 dispatcher strengthen the tip's reliability. In *Navarette*, the Supreme Court indicated that tips placed via 911 are especially reliable, because the "technological and regulatory developments" that allow 911 dispatchers to identify callers presumably discourage false reporting. *See* 572 U.S. at 401. Here, the security guard was no mere tipster, but someone whose occupation included calling the police to report suspicious activity, and he plainly identified himself. Gov't Ex. 1 at 01:08. By identifying himself to the 911 dispatcher, the security guard made it easy for law enforcement or his employer to hold him accountable for false reporting, making it reasonable for law enforcement to give weight and credibility to his information. *See U.S. v. LaGrange*, 981 F.3d 1119, 1122 (8th Cir. 2020) (explaining that police are entitled to give a non-anonymous informant's tip greater weight because police can hold the informant accountable for any false information) (citing *U.S. v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008)); *U.S. v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017) (emphasizing 911 caller's decision to identify herself in holding that her specific and contemporaneous tip was reliable).

Mr. Rodriguez points out, correctly, that his vehicle is a blue Nissan Sentra—not a black Honda Civic—and that the officers noticed this color mismatch during the stop of Mr. Rodriguez. Def.'s Mem. 9-11. Mr. Rodriguez asserts that once the officers realized the

car was blue, any argument that the security guard's tip generated reasonable suspicion to stop Mr. Rodriguez falls flat. *Id.* The Court disagrees.

While it would have been objectively unreasonable for the officers to rely on the security guard's tip to stop a tan minivan or white truck, Gov.'s Mem. 11, that is not what happened: the officers stopped a dark blue sedan. Because the security guard's interaction with Mr. Rodriguez occurred late at night, it was reasonable for the officers to assume that the darkness caused the security guard to mistake the car's color, make, and model. Moreover, when the officers spotted Mr. Rodriguez's car mere minutes after the 911 call, it was the only car running in the parking lot, and it was "right exactly where [the security guard] described [it] to be," Tr. 15, corresponding to the information the security guard provided. When considered within the totality of the circumstances, the single fact that the security guard misidentified the vehicle's color shade and its make and model does not vitiate the tip's reliability. *See, e.g.*, *U.S. v. Slater*, 979 F.3d 626, 632 (8th Cir. 2020) (explaining that "investigating officers must be allowed to account for the possibility that some descriptive factors supplied by victims or witnesses may be incorrect") (citation omitted).

## B. Reasonable Articulable Suspicion

Mr. Rodriguez argues that the security guard's tip was too "conclusory" and "vague" to support a *Terry* stop. Def.'s Mem. 12. As discussed above, however, the security guard's tip was actually quite detailed, and when combined with the fact that Mr. Rodriguez was in a running car parked outside of a closed business at night, there was ample suspicion for an investigative stop. In addition to parking outside a designated spot and openly counting money in the store's parking lot after hours, Mr. Rodriguez refused to leave when asked and

made brazen comments to the security guard, including telling the security guard "[not to] worry about it." While counting money is not inherently illegal, openly counting money late at night in a parking lot and refusing to leave is strange, and may warrant further investigation. *See U.S. v. Dawdy*, 46 F.3d 1427, 1429 (1995) ("Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence.") (citations omitted); *see also U.S. v. Reddick*, 910 F.3d 358, 361 (8th Cir. 2018) ("Law enforcement officers are entitled to evaluate the totality of the circumstances in deciding whether reasonable suspicion is present, and they may possess reasonable suspicion even when innocent explanations can be put forward for each individual circumstance.") (citations omitted). But the officers had even more information than this strange behavior to justify further inquiry.

At a minimum, the security guard's information paints the picture of an intoxicated individual. Between the security guard's description of Mr. Rodriguez's strange behavior and his ultimate conclusion that Mr. Rodriguez was on drugs, the officers had an objectively reasonable basis to suspect that Mr. Rodriguez was sitting behind the wheel of a running car while intoxicated. Sergeant Schwab credibly testified to this effect, explaining that a primary factor in his decision to stop Mr. Rodriguez was "the public safety side of things," because he "needed to make sure that it wasn't an impaired driver leaving the lot." Tr. 33. Moreover, when the officers arrived at the parking lot, Mr. Rodriguez began slowly inching his car towards the exit to the parking lot, making the officers' concern that Mr. Rodriguez was about to drive his car while intoxicated even more imminent. Based on the totality of the

circumstances, the Court finds that the officers had reasonable suspicion to stop Mr.

Rodriguez.

## Recommendation

For the reasons set forth above, the Court concludes that Mr. Rodriguez's challenge to

the seizure of evidence made in this matter must fail. Accordingly, the Court recommends that

Mr. Rodriguez's Motion to Suppress Evidence [ECF No. 30] be DENIED.

Date: February 3, 2021

_s/Katherine Menendez_
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.